Susan Fay Hutchinson presiding. Please be seated. Your Honor, this is the first case of the morning called 213-524, David John v. Wheaton College, Thomas Pratt & Bohlingers, on behalf of the F1, Mr. John David Bohlinger III, on behalf of the Bohlingers, Ms. Christine Olsen-McTighe, on behalf of the Pratts, Mr. Thomas Pratt, Mr. Michael Reese, and on behalf of Wheaton College, Mr. Christian Bohlinger. Good morning, counsel. I apologize. I was driving safely and everybody else was driving safer. So I apologize for the delay. We do have a motion that I understand you communicated some time limits to Mr. Mangan, and of course we would like to stay generally within those time limits, but we understand that if we delay you with questions, we will not cut you off. All right, Mr. Mulgoon, are you prepared? Good morning. Good morning. I'm John Mulgoon. I'm representing the Plaintiff Appellant, David John. May it please the Court. As we say in our briefs, this is really a simple case. There was information in a student file, private information. Information in student files are federally protected. That information was known by three people, three entities, Mr. John, the woman at issue, and Wheaton College. That information was then transmitted to the Bohlingers in Arkansas. How did this come to light? This came to light, Judge, in a custody suit that Mr. John has engaged in with Ms. Megan Bohlinger over their son, who was a product of their relationship that was outside of marriage. Was it used? Was the information used in the custody matter in Arkansas? It was inquired upon. I'm not privy to all that was going on there, but this was a battle of reputations. Thank goodness I don't do divorce or family law. I guess it got ugly of personalities and who's the right parent, and both sides were trying to dig up dirt on you. Let me ask you, I'm going to comment, there was some motion to strike portion of your brief, but one of the problems I had in reading your brief, you didn't cite, you didn't pin-cite your citations, your case authority prior to January 1 of 2011. I'm sorry, Judge. You didn't pin-cite, and it makes it very difficult to, not difficult, more time-consuming to examine the authorities that you cite when you don't cite to the page numbers. Judge, I think Mr. Justice, I apologize for that. Do you know that that is, when you fail to do that, you can waive the argument by not following the rule. I understand that, Mr. Justice, and I'm not as experienced as Mr. Rice is in this arena. I have a handful of appeals over my 30 years here, and I do understand that the new numbering system, the new citing system is much more amenable to paragraphs. You complied and cited the paragraphs for the new cases, but most of the authority you cite are before January of 2011. You didn't pin-cite a single case, so I just want to remind you, don't do that. I won't do that. Don't do that. I'll pin-cite them. My next question is this. Do you have a single case that stands for the proposition that public disclosure of a fact that turned out to be false, and the disclosure includes that the allegation was false, can sustain a cause of action for public disclosure of a private fact? Do you have a case that states that? Judge, I believe that was exactly what happened in Duncan v. Peterson, which we have cited in our briefs. In that case, a deacon was accused of having an extramarital affair, among other things. The original complaint was dismissed. It went to trial. The deacon claimed that that was a false allegation. It went to trial. The jury found that that was a violation of a public fact and found it was actionable. So I think that the deacon case is right on point. In fact, the deacon case also talked about the small group exception. Was the disclosure in the deacon case that he was falsely accused of this? Do you understand the difference? I understand the difference. My point is that the disclosure by Wheaton College was that 25 years ago Mr. John was falsely accused of getting a girl pregnant and falsely accused of counseling her to have an abortion. He was accused of that. That was a false accusation. And the disclosure was that it was false, correct? Yes, Judge. But I think that the overriding principle here is that where there is smoke, there is fire. And that's why these allegations of the private fact is that it's offensive to even be accused of this, whether the accusation is true or false. Well, it has to be – you would agree our review is de novo, correct? Yes. So we have to look at the entire context of the statement, the disclosure, the private fact that's disclosed, and look at the entire content, including the remoteness, the 25-year time period, and decide on its face, is that so egregious that it would offend the sensibilities, so to speak, of a reasonable person, not some – just a reasonable person. Would a reasonable person take action? Certainly, Mr. Justice. You would not want to be accused of a false accusation. You would be offended by that. You would have to – you would be offended if you were to defend yourself about that. It would be very offensive. I would be – I think everyone would be offended to be accused of something that – especially if it was false. Would a reasonable person hold that against that person 25 years later, that 25 years ago he was falsely accused of doing these two things? Certainly. Certainly. Certainly. Do you have a case that says that? That's my question. Well, I don't have a case that says that, but I think the ruling of the Duncan matter falls right in line with that principle. Let me ask you something. The question – I believe that this accusation was used in an interrogatory? Yes. And it was asked of your client in an interrogatory? Yes. And at the time that they asked your client in this interrogatory, had they said, have you been accused of this false accusation? Yes. So they said at that time it was – I'm sorry. They said, have you ever been accused of filing a child out of wedlock? Have you ever been accused of counseling someone to have an abortion? Right. Right. They never said, have you been falsely accused? No. They were taking it at face value that, again, where there's smoke, there's fire. Not only did it happen 25 years ago, but did it happen at any other time. So it opened up a whole can of worms, so to speak, that was offensive and that was going to be tried to use to take the man's son away from him. That's very offensive. And as a result of that, digging into that false accusation, that's when he lost the position with the wrestling team. Yes. Yes. Which gets us to the meeting with Mr. Pollard, who has the reputation of being someone who cleans up messes for Wheaton College. I would say fixer, but that kind of has a negative connotation, especially down in Chicago. But he has this reputation. We elect certain instances with the baseball team and several others where he has come in and tried to clean things up. Why else would Mr. Pollard meet with Mr. John about these allegations? Why else would Mr. Pollard say, yes, Wheaton College slandered you. Yes, they committed libelous acts against you. But let's put that aside and let's try to move forward. Why else would Mr. John meet with Mr. Pollard but for the fact that he's representing Wheaton College? There's no reason for this meeting if Wheaton College is not acting, or if Mr. Pollard is not acting as an agent for Wheaton College. The allegation against Wheaton College was dismissed for failure to state a cause of action. Does Mr. Pollard's comments, as alleged in the complaint, change that particular, or should that have been considered as a true fact that he had met with Mr. John and that he had said X, Y, and Z? Yeah, especially in a 615 motion, Mr. Justice, is that all alleged facts should be taken as true. As we argue, Wheaton College brought a 615 motion, there's no doubt about it. I'm not trying to say it was another type of motion labeled 615. It was a 615 motion. I think it was a proper 615 motion. Because what they're saying is not so what. Yeah, let's take all these things true. So what, no harm. They're denying them. Yeah, they're denying them. I mean, even their argument, even their briefs are replete with argument, I mean, denials. Well, how did the trial judge treat the argument and the denials as you're identifying? You know, Ms. Justice, I have utmost respect for the trial judge. But it's inexplicable to me why she made the decision that she made. Except that we did have a pretrial conference, and this is off the record, but in the pretrial conference, she thought he was going to lose, ultimately. And she had just finished a medical malpractice case where the plaintiff spent a ton of money and lost the medical malpractice case. And it's my, if you're asking me why, I think, there's nothing in the record, but why I think she wanted to save Mr. Johnson money and time and effort in this case because she thinks he's ultimately going to lose. But that's a proper determination. Let's go to trial. Let's have discovery. Let's, if we have to argue a summary judgment motion, let's do that. But let's take depositions of these people and see what we have. You know, in listening to your argument, I think it's interesting that you're, it's not just the unauthorized disclosure of the private fact, which, again, on its face, he was falsely accused 25 years ago of getting a girl pregnant and counseling her to have an abortion. But it was false. So that information alone is also, it's the snowball effect is what you're arguing. Yes, exactly. That disclosure was then parsed out and misused, and that began this whole episode that led to his loss of his relationship with Speaker Hastert, et cetera. That's your argument. But my point is that, you know, the Supreme Court has cautioned us about expanding invasions of privacy, expanding the tort. And doesn't your argument really ask us to expand the tort? Because we're looking beyond just that. What's the private fact that was disclosed on its face? Is it so offensive that it would offend our sensibilities? Or is it the snowball effect, as you point out? How do we look at it? As I always tell my clients, there's always two parts of any case. There's a liability and there's a damages. And you can have a great liability case, but if there's no damages, well, you know, where are we at the end of the day? We don't know what those damages are. We haven't explored the damages. There is some damage. Is it a dollar or is it a million dollars? That's not an issue here today. I'm not talking about a snowball effect of damages. What I'm talking about is there was this disclosure. It was wrongful. I'm talking about just looking at your complaint because that's what we have to do, a de novo review of the complaint. Does it withstand a 2-6-15 motion? That's my question, not with regard to what ultimately the damages are. How do we look at it? The disclosure was, and that's where we look at that point in time of the disclosure, to Mr. Pratt. 25 years ago, Mr. John was falsely accused of getting a girl pregnant out of wedlock and falsely accused of counseling her to have an abortion. That's the disclosure. That's the disclosure. And such a disclosure, as we've discussed, is offensive and it was published. And so I don't see any expansion here of existing case law. I don't see any expansion here of the Duncan case. It's very similar to the Duncan case, so I don't think we have to worry about that. Is that an issue for the dryer effect? The issues that were raised in the 2-6-15. Is a 2-6-15 motion one that you're just supposed to come in and deny everything? Is that the basis of a 2-6-15? No. A 2-6-15 says, okay, yes, A, B, and C are true. It's not a cause of action. I always think of 2-6-15s as a pro se litigant comes into court and has a hodgepodge of allegations but doesn't add up to anything. A 6-15, again, is not a denial. Everything is true here. Even in light of the fact that everything is true, there's still not a cause of action. Is that the type of 2-6-15 that's filed in this case? I don't think so. I think what their argument is is that it's a not true. Even their arguments, they say Wheaton College strongly disputes these facts. That shouldn't be a proper argument for a 6-15. Pollard was not an employee is in the briefs. That's a denial of fact. So that's why I'm saying it's a 6-15 motion. They just haven't complied with the rule, with the parameters of 6-15. Well, Justice Burkett seems to be concerned with one of the allegations, actually a couple of the allegations in the complaint, are that he was falsely accused of. So if the public dissemination of private facts requires that the facts be true, is falsely causing a problem here, that word falsely? It apparently did for the trial judge. Is it really a problem? I think we have a statement that he was falsely accused. Correct. That it is true that he was falsely accused. All right? So the true statement is the accusation. All right? Your point is that the book should have stayed closed. Exactly. And if that book had stayed closed, there would have been no public disclosure, there would have been no harm done on this issue. Just being accused of it is offensive. Yes. Yes. I would think that to any reasonable person. You're forced to defend yourself. Actually, a true accusation, okay, it's true. You know, I got a D in geometry and it's embarrassing, but it's true. I mean, you know, but a false accusation is even worse than a true accusation. So, I mean, reasonable people, reasonable people take responsibilities for their actions. I take responsibility for that D in geometry. But you can't take responsibility for false actions. And that's, I think, part of the offensiveness. One of the troubling aspects I saw in the brief is that you didn't really argue this point very well in your brief, but you're doing a better job now. I'm better on my feet than I am on this issue. You know, 25 years ago, does the remoteness of the accusation play any role, do you think? You know, we're in campaign season now. And, you know, all these things are coming up about all the different candidates. And all the candidates are saying these are false accusations. But they're offensive to them and they feel responsible. And some of them are 25 years ago. Some of them are even further. So, I don't think the remoteness in time has any bearing on this case. Your time has passed. If you want to sum up now, you'll have enough time. Well, I wanted to briefly talk about the minimum contacts. I'll give you a couple minutes. That, as we argue in the brief, if this was, we want to talk about information, if you're talking about money. And money that was in some place in Wheaton College, some funds. And the Arkansas defendants asked their Michigan friend to do what he could to get that money out of Wheaton College. And the Michigan defendant used his connections and the money was then sent to Arkansas. I don't think there would be any argument whatsoever that Illinois had jurisdiction over that conversion of funds. Just in this case, think of the information in this file, protected, as money. And even though the money was spent somewhere else, and even though these people never came into Illinois to get this money, certainly Illinois courts would have jurisdiction over that conversion. Wouldn't the Green case say otherwise? It's an old Supreme Court case. Old is a relative term. An older Supreme Court case. But it was a Texas defendant and money from Illinois being passed into Texas. And it was Illinois money that went into a Texas bank account. But it was not money that belonged to an Illinois party. Both parties were outside of Illinois. The property was there. Here we have property in Illinois being taken from an Illinois defendant. Certainly the minimum context, the fairness doctrine, the purposely directing your actions towards Illinois, and Illinois plaintiff, shares the minimum context standard from the United States Supreme Court. Once again, in this particular motion, in hearing on this motion, were the affidavits in any way used by the trial court? Again, Judge, we had a motion to strike those affidavits. The trial judge did not want that issue briefed. She said, I will deal with that with the motions to dismiss. The affidavits should have been stricken because all they did was merely contradict. We don't have any contradiction. We agree that the Arkansas defense never came into Illinois on this. Well, the allegations in the complaint say that they may have come in during some conferences or things of that nature, but do your allegations pin those times to any of these conversations? The jurisdiction resides not on physical contact with the state. The jurisdiction has to do with their purposely directing their actions towards the information in the state and Mr. John, who is a resident of the state. As you stated, Ms. Justice, that my time is now really up. I would rely on my arguments that stayed in the briefs for any other issues. All right. You'll have an opportunity for rebuttal. Thank you. Oh, Mr. Pollan's getting up. Okay. It looked like Mr. Reese's was getting up. I was confused. Good morning, panel. Christian Pollan on behalf of Wiener College. Good morning. Let me address some of the questions asked because I do think there is some confusion about the claims that were asserted in this case and the claims that were not asserted in this case. Well, I mean, the complaint speaks for itself. So what is there confusion about? The confusion, it seems to me, is about whether these allegations are true or false and what that might state a claim for. Well, why is that an issue at a 615 when the allegations before us are taken as true and possibly not real artfully drawn but taken as true? It's an issue here because I think plaintiff's counsel and even the panel is focusing on the falsity and the damage to reputation, which is not a factor in a public disclosure of a private fact claim. The Duncan case is not a public disclosure of private facts claim. It's a false light claim. There was a defamation claim that the plaintiff pleaded in his original complaint and then voluntarily abandoned. So before you, you have a claim solely of public disclosure of private true facts. And unfortunately, plaintiff missed the mark on those three essential elements. Well, the truth is that he was investigated for a false book, turned out to be a false claim. And I'm sorry. I counsel's argument was that it's not the falsity. It's the fact that he was accused and there was an investigation. Yes, I'm sorry. That's not an accurate statement of facts. The plaintiff had fathered a child out of wedlock roughly two years ago. It was that conduct that came to the attention of the college. This allegation from 25 years ago actually never made it into the Arkansas proceeding. It's plaintiff's pure speculation based on one of 80 interrogatories that was inadvertently sent to him by Skype that he thought that somebody in Arkansas might have heard about the allegation 25 years ago. Well, isn't that an issue for the trier of fact whether or not they heard about that allegation? No, because it's not pleaded in the complaint that there was a public disclosure of private facts. What we have in the complaint, the only plea in the complaint is that Wheaton College's president disclosed to a single person, Tom Pratt, a former trustee of the college, who plaintiff did not even know and had never met, a fact that from 25 years ago he was falsely accused of something. Well, why is that Mr. Pratt's business anyway? I mean, if the issue, if it was in, if Mr. Reichen found out from a file, unless he talked to Jane Doe and there's no allegation that Jane Doe was contacted here, how does President Reichen identify this to anybody? Well, to anybody. We're going outside the complaint now. No, I mean, it's alleged in the complaint. Not the basis or the reason for his doing so. It doesn't, why did he do it anyway is the issue I'm asking. Why did he do it? What would be the purpose of doing this when we have depositions from the Arkansas case that have become part of this case about what people did, making telephone calls and commenting and sending and things of this nature? So how can you say it's not alleged? Or that it hasn't been properly alleged? What I'm saying is that what is alleged in the complaint is solely that President Reichen disclosed to a single person this allegation. Setting aside whether it's true or not, because we accepted the complaint as it stood on 615. Counsel's representation that we were trying to go beyond the record is not accurate. We never relied on anything outside the complaint. We relied solely on the 233 paragraphs in the complaint. I mean, we didn't have to go outside the complaint. But Reichen gave the information to Pratt. Pratt, what did he do with the information? It is alleged that he gave it to the Bollenders. And what did the Bollenders do with the information? Nothing. They didn't attempt to use it in the custody battle? No. There was no interrogatory concerning that in the custody battle? Absolutely not, Your Honor. What is described in a law argument and not in the record and not in the complaint is the fact that, and if you want to know the details, it's kind of crazy because it shows how speculative and ridiculous the plaintiff's claim is. But the question, have you ever filed a father to child out of wedlock, appeared as one of 80 proposed interrogatories that Megan Bollender herself accidentally Skyped to the plaintiff. She had been apparently doing some work on her own, on her own computer, on the Internet, finding good questions to ask. She meant to say those and send those to her lawyer. In fact, she inadvertently sent them to the plaintiff. There's another question, though, that follows that. Have you ever counseled anyone to have an abortion? No. I looked at it yesterday.  I would love to see that, Your Honor. I don't have it with me, but I think if you look at the record, there is something. I may be paraphrasing it, but abortion was the last word in that interrogatory that mistakenly got Skyped. Okay. Even then, again, this was Megan's speculation in a list of long questions she wanted an answer to. Why would that? All right. So it was her speculation. She sent it to him, and now he has some concern that someone may have entered into his file or gotten information about him. Because is there any allegation that he counseled her to get an abortion when she was pregnant with Isaiah? Actually, there is, and perhaps that's why Megan Bollender herself was articulating that. I don't know. I know that's outside the complaint, so I'm not here to argue things outside the complaint. But if you're asking about the background, that's the background. The allegation from 25 years ago never appeared in the Arkansas custody battle, and the plaintiff doesn't believe otherwise. Isn't, at minimum, what the president of Wheaton College did in turning that information over to Pratt, isn't that a FERPA violation? It's not. There's not a private cause of action for a FERPA violation. The information, well, I guess there's a lot of factors we could go into. Now that's in the complaint, so I don't know how much you want to know about that. Mr. Pollard indicated something, didn't he, that Wheaton College had done something wrong when he talked with Mr. John? I can see the plaintiff alleges that Mr. Pollard said that. And we have to accept that as true at this time. That's right. So why would you, I mean, why would there be any denial of that as a fact when we're at this stage of the proceedings? I'm not before you arguing something outside the complaint, Your Honor. But that doesn't affect the validity of the public disclosure of private facts claim. Maybe we can move to the next element that was not pleaded. A false accusation from 25 years ago, it cannot be, as a matter of law, highly offensive to the reasonable person under the case that we cite in our brief. If I say that, Justice Burkett, 25 years ago, I remember that somebody falsely accused you of taking a bribe on the bench. I guess you want to up the bench at the state's attorney's office or whatever. No, that is not the disclosure of a highly offensive true fact about you. For example, the Miller case is talking about a mastectomy, a highly personal true fact that was disclosed to, quote, several co-workers. We have an allegation which has said, well, he was, the plaintiff was falsely accused of something 25 years ago. The president of the college has allegedly communicated that to one person. We don't even come close to making allegations of a public disclosure of private facts claim. And there are cases that indicate one person can be a public disclosure if, based upon how that is used. Isn't that correct? That's incorrect. There's not a single case in Illinois that justifies a disclosure to a single person. And your position is that this would be an unwarranted expansion of the claim? Absolutely. The Illinois Supreme Court has not even recognized the special relationship exception under the PDPF claim. Let me address also plaintiff's argument as the Duncan case. Again, we're mixing apples and oranges here. The Duncan case is not a public disclosure. It's a defamation case. What's that? It's a defamation case. No, actually, it's a false light case, a very different type of claim. The disclosure there was as to three board members on the board of the plaintiff's church making very serious allegations about the pastor of that church. Which then had serious consequences for his ability to pastor that congregation. It was that he abused alcohol. It was that he had an affair. It was that his ordination at the prior church, the dependent church, was going to be revoked. That has nothing to do with the PDPF claim. And, in fact, in that Duncan case, as you'll note, it was three board members. It wasn't a single person. And remember, Pratt has no relationship with the plaintiff. There is no special relationship at all with Pratt, the person to whom the disclosure was made. So it's impossible on these facts to sustain a PDPF claim. Any other questions? Speak to me about the minimum contacts. You're indicating that the parents of the young girl who was the mother of the child had no minimum contacts in the state? If I may just, I'll defer those questions to my co-applicants. You're just representing the college. I'm sorry. Perhaps we could spend a few minutes on the tortious interference claim. That's fine. We haven't addressed that yet. Here, too, the allegations of the complaint. Remember, we have lots of allegations to work with, 233 paragraphs. Did not allege any of the five elements of a tortious interference claim. The first was plaintiff had to have a contract with Dennis Hastert. Okay, now there's a separate tort for the tortious interference with business expectancy. That is not what's pleaded. Plaintiff tried that claim in his first amendment complaint, abandoned it in his second complaint. So before this court is solely whether there was a tortious interference with a contract. The contract that was alleged did not meet even the basic elements of a binding contract. It has to be a valid, enforceable contract. And plaintiff alleged, well, I had a business relationship with Dennis Hastert. It was for consulting and, quote, consulting and other service, quote. Plaintiff said in his affidavit that was attached to his opposition to the motion to dismiss that this was a permanent contract. So somehow the former U.S. House of Representatives speaker is now beholden to plaintiff for the rest of his life to do whatever plaintiff says in terms of his consulting. What about the letter that Representative Hastert wrote to someone in California indicating that he wanted to meet with him on behalf of Mr. John? What does that represent? Yeah, I don't deny all. It is pleaded in the complaint that there was a business relationship. Okay. That e-mail and the other documents and the other allegations of the complaint merely established that the two had adopted some kind of business relationship. But it was either a permanent contract barred by the statute of frauds or it was a terminable at will relationship for which there could be no damages on tortious interference with contract theory. And so either way. It was a relationship wherein Mr. John Anwell as well as Mr. Hastert had benefited financially from that relationship, correct? No. It's alleged. Actually, it's not alleged that they had benefited. It is alleged that they were to benefit. It is alleged that if Hastert provided various forms of services, then he might be entitled to some kind of equity interest in a various range. And again, that was far too vague to even be forcible. I think that's the budget for my time. Any further questions? Thank you. Mr. McTighe, you're here on behalf of the Bollingers. I am, Your Honors. Christine McTighe on behalf of the Bollingers. I do not have much to add other than what's in our brief. And to answer questions, I wanted to address three questions the bench raised earlier. Justice Shostak, you asked about Megan Bollinger, the mother of the child. And it's our position that she has, if you could make degrees of the Bollinger family of who has connections to Illinois, I would say it's Megan and Mrs. Bollinger who have the least amount of contact, if you could even make that distinction. She had nothing to do with this state. She wasn't asking for information in the state. She was a party to the custody dispute in Arkansas. There was some question. I don't remember, Justice. Well, you answer your questions, and then I'll come back with mine. I was just going to say there was some question, I don't remember who asked it, about how did Judge Webster deal with the affidavits. That was a question I had. And she said at the hearing, I'm only going to consider what I consider, I'm paraphrasing, obviously, what I consider to be admissible in evidence. That's true. But then she ultimately found, at least I think in Mr. Pratt's case, that no tort occurred in the state of Illinois. Isn't that a ultimate finding not only of this case? And so how then, where, how did she do that? What did she use for that if she didn't use the affidavits? I'm not saying she didn't use the affidavits because there are. Well, let's say she didn't use the affidavits improperly. Well, if you look at, all right, if you take out the sentences in the affidavits saying I didn't commit a tort or didn't commit a tortious act, if you look at all the other statements of fact in there, including the allegations of the second amended complaint, that Bolanders did not have the minimum context, maybe saying they didn't commit a tort here isn't an artful phrase. I think the point is they didn't either, either section 2-2093 wasn't met, the commission of the tortious act, or that the minimum context were met. But nothing happened here. In Mr. Bolander's affidavit and Mrs. Dixie's affidavit, and I don't mean to call her by her first name. No. We have too many Bolanders here. I apologize. No, no. Dr. Bolander says at no time did I ever engage in any conspiracy with regard to David John. I did not participate in any telephone conversations with David John. Mrs. Bolander, I did not during any conversation, telephonic or otherwise, threaten David. I never engaged in any conspiracy and Megan Grasick. The other Dr. Bolander basically says the same thing. Aren't those attempts to refute the factual allegations of the complaint and have nothing to do with jurisdiction? Well, they have everything to do with jurisdiction. How? Because the less contact an individual has with the state of Illinois, the less chance that person is either going to meet the terms of the long-arm statute or, more importantly, comply with minimum context. There's nothing wrong in filing a motion to dismiss a complaint with statements in an affidavit which conflict with the allegations in the complaint. Let's talk about that for just one moment. Megan Bolander's deposition, she acknowledged that she and her father had discussions with Mr. Pratt, and Mr. Bolander also acknowledged that he had discussions with Mr. Pratt about David John's background with Wheaton College, correct? Yes. And that's the premise of the complaint, that the Bolanders solicited or conspired with Pratt to obtain damaging information against Mr. John to be used in Arkansas. Yes. So on its face, isn't your argument that while Illinois may have played a role, you didn't target Illinois. If it's true you were targeting Arkansas, and if this complaint has any validity, it should have been brought in Arkansas, not in Illinois. Isn't that really what your argument is? Yes. Yes. So you're not disputing that he has some evidence that there were communications with people in Illinois. The argument is that it should have been brought in Arkansas? Or is it both? It's both. I am disputing that the conversations took place in Anthony. Because he's alleged that these conversations occurred, and your clients acknowledge that there were some conversations. There's no question there were conversations. However, it is perfectly proper to bring a motion to dismiss under 2619 for lack of jurisdiction to have the affidavit attached, which can't contradict the allegations in the complaint. Remember, this was not a verified complaint. But it goes to the claim you're raising, which would be no context. And the allegations that I've resided in Rogers, Arkansas, I only periodically travel to the state of Illinois for religious conferences, those go to the claim. The others go to the ultimate fact of whether there was a conspiracy. And it appears, it appears from the record that the judge looked at not only the claim refuting evidence, which would be I live in Rogers, Arkansas, and I've lived there for some time, but she might also have looked at the allegations refuting the ultimate fact. I understand what you're saying, Justice Hutchinson. And if that's the case, isn't that inappropriate at this stage of the proceedings? If she did that, and there is nothing in the record to indicate that she did, I think this court is well aware that it is presumed that the trial court knows the law and follows the law. This court can affirm on any basis in the record. There is plenty of evidence in the affidavits to support her finding that their jurisdiction is lacking over the Bollinger's. The jurisdiction issue you were addressing, the 2619. Correct. And the 2615 that was filed was basically denying every allegation. That was the college's motion. Correct. And I had another point and I completely forgot it. Sorry. No, no, no. It wasn't important. If I could make one more point, otherwise I'll be seated. Thank you. Thank you. And you can make that point. Oh, okay. You can make the point. There were some questions earlier about interrogatories and things. I just wanted to remind the court that the second amended complaint is the subject of the motion here. There was, the plaintiff filed a motion for you to file a third amended complaint, which has different attachments, which are not attached to the second amended complaint. And I just wanted to clarify that in light of the questions that were being asked. Thank you. Thank you. All right. Now, Mr. Reese. Good morning and may it please the court, I'm Mike Reese. Let's go straight to the affidavit. First of all, counsel never procured a ruling on his motion to strike. And it didn't procure a ruling on his motion to strike. I'm not sure that he's preserved any issue complaining how the judge considered the affidavits of either the Bollinger defendants or Tom Pratt. She said she was going to deal with it, but she wouldn't parse through the paragraphs and she wouldn't do one other thing. And I can't remember what it was. She said that she would not consider any conclusions in the affidavits and the affidavits had to be based on facts personally known to the defiant. That sounds to me like a ruling that she would not strike them because she didn't and she used them. Well, she said that she was going to consider what was proper and not consider what was improper. And counsel never went back at any time, either at that hearing or subsequently, to make his record with regard to the motion to strike. Now, whose burden is that? It's his burden. It's not my burden. It's not the defendant's burden. Let's make it also very clear. We're not making a 2615 motion. Our motion is properly supported by affidavits. Those affidavits can say that Tom Pratt is a resident of Michigan. He has lived in Illinois since 1967. He didn't have any meetings or any communications with any Illinois actor relating to any alleged agreement to publish private facts. He can say all that and then it's up to the plaintiff to file his own affidavit. And he did file a very lengthy, detailed affidavit in response. There's nothing inappropriate about any of that. And it wasn't made of record. I want to talk to you. I think Justice Burkett really hit the nail on the head regarding the purposeful activity here. The activity is not directed at Illinois. The information starts in Illinois. Okay. It's transmitted in Michigan. It is allegedly used in an Arkansas custody dispute. If the information didn't get to Arkansas, Mr. John wouldn't even know about it. The purposeful activity, the effect of it, is how it was used in a different state. And our position is very simple. Mr. Pratt had no reason to foresee that he would be hauled into an Illinois courtroom because he received information in Michigan and passed it on allegedly for use in Arkansas. Well, did Mr. Pratt perceive perhaps that he might have been drug into any courtroom? Or did that not matter to him? Maybe I'm getting a little bit outside of the facts of the case. Maybe it's just a little offensive to me what happened here. And maybe that's why I'm a little defensive when you sit there and say Mr. Pratt could not perceive that he was going to be drug into an Illinois courtroom. Did Mr. Pratt perceive that his behavior, violating, in my opinion, FERPA, going in and getting private information and spreading it on to some big donors or somebody who had a personal interest in this state, did that, did he ever perceive that he was going to be drug into any court? Excuse me. The only thing we're talking about with minimum contacts is whether he will be brought into an Illinois courtroom. Where did he get the information? The information allegedly, assuming it's true, what was pled in the complaint, would have come from the Wheaton College file. Which is located where? Which is located in Illinois. Okay. But after that, but that by itself, excuse me, that by itself is not why we're here. If he doesn't do it, it's what happened in Arkansas, all right? It's not what happened in Illinois because Mr. John wouldn't even know about what happened in Illinois but for the fact it was published in Arkansas. If there's any wrong, Justice Shostak, it's in Arkansas. And if Mr. Pratt is amenable to jurisdiction, it's in Arkansas, not Illinois. Not for what he allegedly did in passing on information received outside Illinois and transmitted outside Illinois for a lawsuit outside Illinois. The entire conspiracy was designed to favor Megan's custody battle. In Arkansas. Correct. Exactly. And the last thing I'm going to say because I know everybody's time is up. It's always up. The only thing I want to say is, you know, the question of conspiracy, excuse me, the question of conspiracy jurisdiction is problematic. It's never really been formally adopted. We've cited the cases. You've got Knauss v. Guidry. You've got Clowenzie. You've got Cleary on one side that recognize that there's real problems with its viability. And then on the other side, you've got Cameron from the 4th District. And there are questions about whether that is a valid theory. Okay. I don't know that you need to get there. You said you might say that? I said I don't know if you even need to get there because if you affirm in favor of Wheaton College, all right, then Planned Parenthood stated a cause of action against Wheaton College. You can't state a cause of action for the same torts allegedly against us. So at the end of the day, this whole jurisdictional question, as interesting as it is and as much as I'd like to argue it for the rest of the morning, can become a moot point if you affirm. So you're saying we never even need to get to the Justice Department? You never need to get there. So for all the reasons in our brief. So do you want to say anything in support of Mr. Poland's position or are you standing by your original agreement that you'll only address your own? I'm standing by my – I'm standing by – I know that – you've got to know your limitations. And I'm going to stand by what was argued in our brief. And for all the reasons in our brief, we ask you to affirm. Thank you. Mr. Muldoon. Here's a few brief points in rebuttal. To answer Justice Shostak's question, yes, it is a FERPA violation. Mr. Poland is correct. There's no private cause of action for that. Otherwise, it would have been in the complaint. The remedy for a FERPA violation is taking away federal funds from the university. Counsel states that there is no case where there's been a disclosure of one person. The Miller case was disclosed to one person. We argued in the brief, if you look – read the case carefully, it's disclosure to one person and a belief that it was disclosed to other people. But there was only one alleged disclosure in the Miller case. Regarding – let's talk about the tortious interference with Speaker Hassert's contract. If the deal in California went through and Mr. John received money, don't you think Speaker Hassert would be succumbing to a court somewhere saying, hey, we had a deal, we had a contract, there's no way David John was going to meet with Representative Issa without me? I was instrumental in this deal. I had an agreement to get paid a percentage of this deal. Well, he identified that in his letter concerning a possible business relationship. But is there a contract anywhere? It's an oral agreement. Oral agreements are just as valid as written agreements. They agreed that Hassert would do some things, one of which was getting a meeting with the House of U.S. Reps in California, Darrell Issa being one, Representative Bono being another, and that if that deal went through, he would get a cut of it. Hassert spent his time. That's consideration. John paid the travel expenses. That's a contractual agreement. Did they make, did Hassert and John make money together in the past in this type of relationship? They did not. Based on the timing of this. Speaker Hassert came off the bench in 08 and these contracts, these agreements were in place. There was no other one to go to, to obby-dobby. The trial court found that your client had judicially admitted that there was no contract because the first amended complaint said there was an expectancy. Well, there's two types of things. There's the business expectancy. We expected to get profits from these deals. We didn't get profits from these deals because of the interference. That's one thing. The other thing, not that there wasn't a contract, not that Hassert- Stop talking about what the trial court- Again, the trial court's making a finding of fact, not looking at the allegations. The allegations are, is that Hassert went to these places. He spent his time. He spent his influence. He's vouching. When he goes to obby-dobby, there's no way David Brown's going to get a meeting with someone in obby-dobby without Speaker Hassert sitting there right next to him. A letter's not going to do any good. A phone call's not going to do any good. You need Hassert there to get the audience, and that's based on an agreement they had, a contract they had, whatever you want to call it. Are you saying Speaker-former Speaker Hassert terminated this quote-unquote contract because your client had been falsely accused of having- No, because Pollard-our allegations are, is that the Bollingers were going to destroy him. If he can't make any money, he can't pay for lawyers down in Arkansas. If that's the case, they could destroy him without this information. Did Speaker Hassert terminate the relationship because your client had been falsely accused of getting a girl pregnant and falsely accused of counseling her to have an abortion? Because that's what your complaint says. Our allegations-I beg to differ. Our allegation says that Pollard spoke to Hassert and told him to break off the relationship with David Johnson, the dean of the college. And it was tied up with the custody case, but not for that specific allegation, and we don't allege that. We say that in order to damage David John, the college, on behest of the Bollingers, had Pollard-Hassert cut off the relationship. They interfered with the relationship. Briefly on- Do you allege that there's a contract in your second amended complaint, or do you allege that there is a business relationship which amounts to a contract? What's the issue? I don't see-I see that as a difference without a distinction, that a business relationship is a contract. A contract is a business relationship. And that certain things were done that Mr. Speaker Hassert, former Speaker Hassert, would have expected to be compensated for. He would have expected to be compensated for going to California. He would expect to be compensated for going to Abu Dhabi and doing what he did if, on a contingent basis, that there were progress made. That's a contract. That's a business relationship. That's a business expectancy. That's all those things wrapped up into one. There was an agreement between the parties that agreement was interfered with, that contract was interfered with, by Wheaton College. Briefly, the complaint was verified, as opposed to what counsel stated was not a verified complaint. It was a verified complaint. The third amended complaint would have cured any factual problems that may have occurred in the second complaint. And this was only-the second amended complaint was really the first amended complaint, as stated out in the brief. It was an abuse of discretion not to let us file the third amended complaint. And finally, the argument about if Pratt steals the money from Illinois, he steals the information-steal might be a too strong word-he takes the money wrongfully, information wrongfully, it goes spent somewhere else. He still did the-he still directed the conduct towards Illinois. If the money was spent-money spent for a new car, for someone else, it doesn't absolve the receiver of the money from jurisdiction from the state where he took it. So, for all those reasons, and for everything else stated in the briefs, we ask that the ruling in the lower court be reversed. Thank you. Thank you. Thank you, counsel, for your arguments, and we will take the matter under consideration and issue a decision in due course.